UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK SANDERS, ) | |
| ) | |
| Plaintiff, ) | Case No. 19-cv-2308 |
| ) | |
| v. ) | Judge John Robert Blakey |
| ) | |
| SYMPHONY COUNTRYSIDE LLC, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Mark Sanders worked as a nurse for Defendant Symphony Countryside, LLC ("Symphony") d/b/a Symphony of Orchard Valley ("Orchard Valley") until Symphony fired him. Plaintiff then sued Symphony, as well as several interrelated entities, for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (counts I and III) and in violation of 42 U.S.C. § 1981 (counts IV and V), and for sex discrimination in violation of Title VII (count II). [78]. Defendants have moved for summary judgment on all counts. [145]. For the reasons explained below, this Court grants Defendants' motion.

**I.    Factual Background & Procedural History**[1]

Orchard Valley operates a health care facility in Aurora, Illinois, and, along with other "member entities," belongs to an organization called the "Symphony Care

---

[1] The Court draws the facts from the record, including Plaintiff's complaints [11], [24], [78], Defendants' motion (including the statement of facts and exhibits included therein [145], and Plaintiff's response (including the exhibit attached thereto) [146].

Network." *Id.* at ¶ 5. Plaintiff alleges that the Symphony Care Network is both a "family-run business" and "a complex web of legal entities under common ownership and control." *Id.* at ¶ 6 n.1. Plaintiff claims that the Symphony Care Network exerts considerable control over Orchard Valley and other member entities, in that all member entities apply the same workplace policies and utilize the same employee handbook. *Id.* at ¶ 13. He also believes that "Symphony employees" serve as the "point of contact" for any administrative investigations into allegations of discrimination concerning member entities. *Id.* at ¶ 13.

Plaintiff began his employment at Orchard Valley as a Registered Professional Nurse in January 2015 and was fired in March 2018; he alleges that, during his employment, he experienced various instances and acts of discrimination and retaliation. [78] at ¶¶ 20–43.

First, Plaintiff alleges that Defendants discriminated against him by dragging its feet on assigning him a permanent workstation. At Orchard Valley, Plaintiff first served as a "float nurse," as the name suggests, rotating through various work areas, rather than being assigned to one specific work area. *Id.* at ¶ 21. Five months into his employment, Plaintiff requested a permanent work area. *Id.* at ¶ 22. Thirteen months later, and allegedly after Plaintiff made several additional requests, Orchard Valley assigned him to a permanent work area. *Id.* at ¶ 23. Plaintiff alleges that, while he was waiting for his assignment, three similarly situated female nurses—one White, one Hispanic, and one African American—received permanent work assignments almost immediately after they were hired. *Id.*

Plaintiff also alleges that his Shift Supervisor twice directed racially offensive comments towards him in June 2016. *Id*. at ¶ 24. First, Plaintiff alleges that, when he returned from lunch one time, his Shift Supervisor asked him if he had eaten fried chicken. *Id*. at ¶ 25. Plaintiff believes his Shift Supervisor asked this question to suggest that she expected him to eat fried chicken because he is African American. *Id*. He did not respond and returned to work. *Id*. Second, Plaintiff claims that, less than two weeks later, his Shift Supervisor offered him a plum, and, when he declined, she smirked and said "'yeah, I bet you want a banana,'" or words to that effect. *Id*. at ¶ 26. After the second comment, Plaintiff wrote to Orchard Valley's Administrator, describing the comments and expressing concern that he might experience retaliation for reporting them. *Id*. at ¶ 27. Plaintiff alleges that an administrator promised the company would investigate his complaint, but no one ever followed up with him about it. *Id*. at ¶ 27.

Plaintiff also alleges that Defendants denied him a promotion and quality assignments because of his race. He alleges that, in March 2017, he earned his Nursing Home Administrator License, and then asked Orchard Valley's Human Resources Director about joining Symphony's apprentice program for new administrators. *Id*. at ¶ 28. Plaintiff alleges that, in response, the Human Resources Director informed him that he should apply to programs outside of the Symphony Post-Acute Network if he hoped to be considered for an administrator position. *Id*. Additionally, Plaintiff claims that he inquired about a raise on three separate occasions orally and on four separate occasions in letters to either the Orchard Valley

or Symphony corporate office, or both. *Id.* at ¶ 29. Plaintiff did not receive any response. *Id.* at ¶ 29. He believes that Defendants would have taken his promotion and raise requests more seriously if he were not an African American man. *Id.* at ¶ 30.

Also in March of 2017, Plaintiff received a new work area assignment, which he claims required him to take care of more patients than his similarly situated white, female colleagues. *Id.* at ¶ 31. As a result, Plaintiff felt overwhelmed and asked the Staffing Coordinator to be taken off the schedule on March 16th and March 17th. *Id.* at ¶ 32. During his time off, however, Plaintiff received a call from Orchard Valley's Director of Nursing, informing him that he had improperly failed to complete admissions of new patients on March 15th and was thus being suspended for two days without pay. *Id.* In response, Plaintiff again wrote to Orchard Valley's Administrator, explaining that the suspension was unwarranted and retaliatory. *Id.* at ¶ 33. Orchard Valley then rescinded the suspension. *Id.* at ¶ 34.

Despite this outcome, Plaintiff claims he feared continued discrimination, and so he filed a charge of discrimination with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights. *Id.* at ¶ 35. The docket in this case does not include this charge, as Plaintiff never attached it to any complaint.[2] But he alleges that his charge claimed: discrimination and retaliation,

---

[2] As discussed below, Plaintiff did attach a charge filed April 9, 2018 to his initial complaint and first amended complaint; he did not attach any charge to the second amended complaint and this initial charge appears nowhere in the record.

4

based upon his race and gender;³ that his workload had been dramatically increased; that his supervisor frequently scrutinized his work to a much greater degree that other employees; and that he had been passed over for a possible promotion despite his experience and qualifications. *Id*. at ¶ 36.

Plaintiff alleges that, after filing his EEOC charge, he learned that his coworkers started joking that he smelled bad, and he claims that this refrain became a running joke amongst his colleagues; he claims that his coworkers—including Assistant Director of Nursing Patricia Clark—would often crack jokes at Plaintiff's expense whenever they passed by him. *Id*. at ¶ 37. He also claims that, around this time, Orchard Valley's Medical Director asked him why management had a "problem" with him; because the Medical Director made this comment after attending a meeting with department heads, Plaintiff believes that one of the department heads must have complained about him at that meeting. *Id*. at ¶ 38.

In December 2017, Plaintiff complained to Symphony's corporate office, describing another instance of unwarranted discipline in which he was written up for: (1) a medication error that he did not make; and (2) failing to move a resident, even though his Shift Supervisor had instructed him not to do so. *Id*. at ¶ 39. Symphony's Vice President of Human Resources acknowledged Plaintiff's complaint, but Symphony did not rescind the discipline. *Id*. at ¶ 40.

In March 2018, Orchard Valley's Director of Nursing reprimanded Plaintiff in

---

³ Plaintiff alleges that his charge claimed "race and gender" discrimination, [78] at ¶ 36, but the charge actually claims discrimination based on race and sex, consistent with his complaint. *See* [11] at 10; [24] at 9.

5

front of residents and other staff for a charting mistake. *Id.* at ¶ 41. Plaintiff claims that she also informed him that she wished she could fire him and that she did not like that he had reported complaints to Symphony's corporate office. *Id.* As a result of this incident, Plaintiff again complained to Symphony's corporate office, explaining that the Director of Nursing's behavior was inappropriate, and noting that she "doesn't like black men . . . and that her efforts are racially motivated." *Id.* at ¶ 42. Symphony fired Plaintiff two days after he filed this complaint. *Id.* at ¶ 43. On April 11, 2018, after a visit to the facility, interviews, and document review, Symphony confirmed the termination decision via email. *Id.* Plaintiff has since suffered from severe anxiety and depression, for which he takes medication and sees a therapist. *Id.* at ¶ 44.

On April 9, 2018, after he was fired but before Symphony confirmed his termination, Plaintiff filed an amended discrimination charge with the EEOC and the IDHR, alleging discrimination based on race and sex and retaliation. *See* [11] at 10; [24] at 9. More specifically, he claimed that: his supervisor "frequently scrutinizes my work at a higher level than other employees"; he was recently passed over for a promotion, despite his experience and qualifications; and his workload was drastically increased. *Id.* He also claimed that Symphony terminated him in retaliation for filing the previous EEOC charge. *Id.* at ¶ 45.[4]

---

[4] Plaintiff exhausted his administrative remedies and received a right-to-sue letter on this latter charge. [24] at 10. Although he failed to attach the letter to his latest complaint, construing pro se pleadings liberally, this Court will consider this attachment as part of Plaintiff's operative complaint. *See e.g. Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

The EEOC issued a notice of right to sue letter on March 8, 2019, [11] at 9, and Plaintiff initiated this lawsuit, pro se, on April 5, 2019. *See* [1]. Plaintiff amended his complaint twice, filing his second amended complaint, prepared with the assistance of counsel, on June 1, 2020. [78]. After the Court resolved motions to dismiss, [125], [126], the remaining Defendants moved for summary judgment on the remaining claims.[5]

## II. Legal Standard

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Cosmano v. Lottery*, No. 17 C 569, 2021 WL 5050283, at *3 (N.D. Ill. Nov. 1, 2021). In resolving a motion for summary judgment, the Court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

---

[5] Plaintiff initiated this case pro so, was represented by counsel when he filed the operative complaint and litigated Defendants' motions to dismiss, and was pro se again by the time Defendants moved for summary judgment. As a result, Defendants should have, but apparently did not, provide the notice specified in LR 56.2. Although Defendants' failure to comply with LR 56.2 (unlike any failure to comply with LR 56.1) does not constitute grounds to deny the motion, the failure does mean that this Court can excuse Plaintiff's failure to comply with *his* LR 56.1 obligations and thus decline to afford Defendants any presumptions concerning the factual record. *See Turina v. Crawley*, No. 10 C 4292, 2012 WL 568050, at *1 (N.D. Ill. Feb. 16, 2012) ("When a pro se litigant is provided with a Local Rule 56.2 letter, then he is presumed to be on notice of his obligations under Local Rule 56.1, and failure to comply with that Rule results in the admission of the moving party's facts.").

7

To withstand a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The non-movant cannot rest upon mere allegations made in his pleading[s]. *Id.* at 248. (citing Fed. R. Civ. P. 56(e)). Summary judgment is the "'put up or shut up'" moment in a lawsuit. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). The Court must construe the record "in the light most favorable to the non-movant and avoid" the "temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative," *Liberty Lobby*, 477 U.S. at 249 (citations omitted), or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. Analysis

Plaintiff alleged that Defendants made discriminatory comments towards him, denied his requests for a raise, permanent work assignment, and promotion, imposed unwarranted discipline, and terminated him as a result of race discrimination, sex discrimination, and in retaliation for his complaints regarding this alleged discrimination. He sued under Title VII and § 1981. Courts "use the same standard to review discrimination and retaliation claims under § 1981 and Title VII," *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017), and the Court does so below in evaluating the parties' summary judgment arguments.

### A. Retaliation Claims

Plaintiff alleges that Defendants retaliated against him by imposing unwarranted discipline and ultimately firing him. In the first instance, Orchard Valley suspended Plaintiff for two days without pay for failing to complete admissions on new patients. [78] at ¶ 32. In his letter to Orchard Valley management, as well as in his original EEOC complaint, Plaintiff described this suspension, as well as other instances of unwarranted discipline: (1) his workload "drastically" increasing; and (2) his work being scrutinized to a much greater degree as compared to other employees. *Id.* at ¶¶ 33, 35–36. He believes that such conduct stemmed from his complaints to management. *Id.* at ¶¶ 35–36. In the next instance, the Director of Nursing disciplined Plaintiff for both a medication error and for failing to move a resident, as well as publicly reprimanded him regarding an alleged charting mistake. *Id.* ¶¶ 39, 41. Then, Defendants terminated Plaintiff two days after he made another complaint to Symphony's corporate office. *Id.* at ¶ 43. Following this, he amended his EEOC complaint to add that Symphony and Orchard Valley had retaliated against him and terminated him for filing his original EEOC charge. *Id.* at ¶ 45.

To prove retaliation in violation of either § 1981 or Title VII, a plaintiff must establish: "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines,* 863 F.3d at 661 (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), *aff'd,* 553 U.S. 442 (2008)). Both statutes require proof that an employer's desire to retaliate was the "but for" cause of the materially adverse action. *See* 42 U.S.C. §

9

2000-3(a); 42 U.S.C. §§ 2000-2(a); *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *Baines,* 863 F.3d at 661 (applying "but for" causation requirement to § 1981 retaliation claim).

A court should evaluate "the evidence as a whole" to determine if a reasonable factfinder could find a "but for" retaliatory motive. *See Lewis v. Wilke*, 909 F.3d 858, 866–67 (7th Cir. 2018) (discussing *Ortiz v. Werner Enters*, 834 F.3d 760, 763 (7th Cir. 2016)). While courts must still view the evidence as whole, a plaintiff may establish retaliation through the long-established burden-shifting method espoused in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6]

Here, Plaintiff has failed to present evidence showing that there is a genuine issue for trial as to his Title VII and § 1981 retaliation claims. Plaintiff alleges in his complaint that Defendants "drastically" increased his workload and scrutinized his work to a much greater degree as compared to other employees; he also alleges that Defendants ultimately fired him in retaliation for complaining about discrimination. But Plaintiff has failed to present sufficient facts to support these allegations. [146]. Indeed, Plaintiff has not produced anything to support his allegation that retaliation was the "but for" cause of the incidents of discipline and his termination. Without facts and evidence, Plaintiff cannot show that there is a

---

[6] Under the *McDonnell-Douglas* framework, Plaintiff must establish a *prima facie* case that: (1) he engaged in a protected activity; (2) he performed his job duties according to Defendants' legitimate expectations; (3) he suffered an adverse action; and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity. *Lewis*, 909 F.3d at 866–67 (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). If Plaintiff makes this *prima facie* showing, then the burden would shift to Defendants to provide a legitimate reason for the adverse action. *Id*. The burden then shifts back to Plaintiff to prove that Defendants' "stated reason is mere pretext." *Id*.

10

genuine issue for trial as to his Title VII and § 1981 retaliation claims.

Defendants, in turn, put forth evidence that undercuts Plaintiff's retaliation allegations. They assert instead that Plaintiff was disciplined for, and terminated with cause because of, mistakes he made on the job. [145] at 10. Plaintiff's own deposition supports Defendants' explanation: Plaintiff does not dispute the charting mistake, [145-2] at 4–5, and he admits that he secured a prescription for a patient based upon his reading of an old x-ray instead of the current scan. *Id.* at 6–7. Plaintiff also conceded that he could not recall how his supervisor made him feel scrutinized; nor could he recall what his managers did to make him feel singled out or subject to unequal or unwarranted scrutiny. [145-2] at 28. He testified that manager Brooke Rowe was hostile to him and that he did not know why; he speculated that, because they barely knew each other, there "had to be something underlying to it." *Id.* at 30. But he could not recall what Brooke did to make him feel this way. *Id.* at 28. Nor did he tie any such behavior to his complaints of discrimination. In fact, he testified that Brooke was hostile to him, and he believed it was because he is a black male, as he never saw her "interact with other nurses like that." *Id.* at 30. Yet he also testified that other African American employees made mistakes and were not fired for them, suggesting that any unequal treatment had nothing to do with race. *Id.* at 8–9. Likewise, Plaintiff testified that he had a "rapport" with coworkers, superiors, and residents, which also undermines his claim that management was out to get him because he complained. *Id.* at 22.

Because the record provides no factual basis for a reasonable jury to conclude

11

that Plaintiff suffered retaliation, or that any such retaliation stemmed from his complaints, Defendants are entitled to judgment as a matter of law as to Plaintiff's Title VII and § 1981 retaliation claims.

### B. Discrimination Claims

Plaintiff also alleges that Defendants made discriminatory comments towards him, ridiculed him, and denied his requests for a permanent work assignment, raise, and promotion on account of his race, in violation of § 1981 and Title VII, and on account of his sex, in violation of Title VII. To survive a summary judgment motion on a Title VII or § 1981 discrimination claim, a plaintiff must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused" the "discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765–66; *see also Fields v. Bd. of Ed. Of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) ("We apply the same standard to discrimination claims" whether under § 1981 or Title VII).

Section 1981 and Title VII discrimination claims, however, involve different causal requirements. For a §1981 discrimination claim, a plaintiff must establish that the proscribed factor was the "but for" cause of the adverse action. *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S.Ct. 1009, 1014 (2020) (holding that "§ 1981 follows the general rule" that "a plaintiff bears the burden of showing that race was a but-for cause of its injury."). In contrast, a Title VII plaintiff need only prove that race or sex was a "motivating factor." 42 U.S.C. §§ 2000-2(m); *see also Univ. of Tex. SW Med. Ctr.*, 570 U.S. at 348–49.

Just as with a retaliation claim, the *McDonnell-Douglas* framework remains a viable part of this Court's overall analysis in reviewing a prima facie case of discrimination under § 1981 and Title VII. *See Fields*, 928 F.3d at 625. Under this framework, Plaintiff must establish that: (1) he belongs to a protected class; (2) he met his employers' legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Id.* As with a retaliation claim, the Court evaluates the evidence as a whole. *Ortiz*, 834 F.3d at 766.

Plaintiff claims that Defendants discriminated against him when they made discriminatory comments and ridiculed him in front of other staff during his employment. He identified several comments: (1) two instances involving his supervisor in June 2016; (2) jokes about how he smelled; and (3) a question from Orchard Valley's Medical Doctor as to why management had a "problem" with him. [78] at ¶¶ 24–26; 37–38. Plaintiff also described that the Director of Nursing, in front of residents and staff, chided Plaintiff regarding a potential charting mistake, expressed her disdain for Plaintiff's complaints to Symphony's corporate office, and expressed her desire to terminate him. *Id.* at ¶ 41.

Plaintiff also alleges that Defendants discriminated against him when they denied his requests for a raise, a promotion, and a permanent work area. He argues that his raise requests would have been taken more seriously "if he were not an African American man." [78] at ¶ 30. Plaintiff also claims that he did not receive a permanent work assignment for a year and a half, while three similarly situated

13

female colleagues hired after him were permanently assigned almost immediately upon beginning their employment. *Id*. at ¶ 23. Further, with respect to a promotion, Plaintiff claims that Orchard Valley's Human Resources Director informed him that he should not bother applying within the Symphony Post-Acute Network if he hoped to be hired for an administrator position. *Id*. at ¶ 28.

Although such allegations were sufficient to state a claim, at this stage of the litigation, Plaintiff must come forward with evidence to support his allegations. And he has utterly failed to do so. For example, although Plaintiff alleged that Defendants denied him a raise because of his race and gender, he could not, when asked at his deposition, explain why he thought he deserved a raise when he asked for one. [145-2] at 16. Plaintiff also conceded that, given his four years of experience as a registered nurse, Defendants were already paying him more than their pay scale required, and he further conceded that no nurse made the hourly rate he had requested, not even those nurses with more than twenty years of experience. *Id*. at 17–19. Additionally, although Plaintiff claimed that Defendants failed to promote him because of his race and gender, he admitted at his deposition that he "never actually put in an application" for a promotion. [145-2] at 13.

In response to Plaintiff's work area allegations, Defendants state that any delay in assigning him stemmed from the schedule constraints Plaintiff included in his employment application. *Id*. at 8–9. Plaintiff does not dispute the point. Defendants admit that it took them some time to assign Plaintiff to a permanent work area, but also emphasize that they were ultimately able to do so, and, again, Plaintiff

14

does not dispute the point. *Id.* at 9. Further, Plaintiff admitted that, around this time, he was happy working for Defendants and wanted to stay at the facility. *Id.* In short, nothing in the record suggests that any delay in assigning Plaintiff a permanent work area stemmed from his race or gender.

Finally, although Plaintiff claimed he experienced hostility from his managers because of his race and gender, he could not explain at his deposition why he felt this way, and he has offered no evidence to tie any ridicule, discipline, or nasty remarks to his race or gender. When asked at his deposition who discriminated against him, he named manager Brooke Rowe, [145-2] at 30, but could not articulate a factual basis to tie any such hostility to his race or gender. He testified simply that Brooke was hostile to him, and they barely knew each other, so he assumed "there had to be something underlying to it." [145-2] at 30. His speculation cannot support a claim at this stage. *E.g., Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir.1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors"; discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by affidavits speculating about the defendant's motives."); *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.").

To the extent Plaintiff has attempted to prove discrimination using a disparate impact theory, his claims also fail. [146] at 1. A disparate impact claim requires a

15

specific employment practice to cause a "disparate impact on a member of a protected class." *Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 717 (7th Cir. 2012) (citing 42 U.S.C. § 2000e–2(k)). To prove such a claim, a plaintiff must "isolate and identify the specific employment practices that are allegedly responsible for any observed statistical disparities." *Id.* (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994 (1988)) (cleaned up). A plaintiff may not, however, rely solely upon allegations or generalized policies as evidence of a disparate impact. *Id.* (citing *Smith v. City of Jackson,* 544 U.S. 228, 241 (2005)). To establish causation, there must be "'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Id.* (citing Watson, 487 U.S. at 994–95).

Here, Plaintiff has failed to present evidence showing that there is a genuine issue for trial as to any disparate impact claim. He has not isolated and identified *specific* employment practices responsible for any observed statistical disparities. [146] at 1. Alternatively, to the extent that Plaintiff sought to identify and isolate Defendants' termination practices, *id.*, or their promotion practices, [145] at 8, he has presented no evidence to support these allegations. [146] at 1. He has offered no statistical evidence to show that Defendants' termination or promotion practices caused the exclusion of applicants for jobs or promotions because of their race.[7] *Id.*

In fact, Plaintiff's deposition testimony once again supports the entry of judgment in Defendants' favor on this claim. For example, Plaintiff testified that

---

[7] Similarly, if Plaintiff intended to assert any pattern-or-practice and hostile work environment claims, he has failed to marshal any evidence to support his allegations.

16

other nurses made mistakes and were not fired, whereas he was fired for the mistakes he made; yet, when asked to identify those other nurses, he named two black nurses, one male and one female. [145-2] at 8–9. Although he testified that this same black, male nurse was similarly denied a promotion, he also testified that the denial related to an issue with his teeth. *Id.* at 12–13. Plaintiff also conceded that the same black, male nurse represented that Brooke was not prejudiced. *Id.* at 20. Plaintiff testified that he was not aware of any other African American male nurses that experienced the issues about which he is complaining while working for Defendants. [145-2] at 12. Additionally, Plaintiff estimated that 30% of Defendants' nurses were black and roughly 20% of Defendants' nurses were white. [145-2] at 11. He testified that only about 10% were male, but he indicated that the percentage was about the same at BRIA, his next employer after Symphony. [145-2] at 11–12. In short, the record includes no evidence to support a disparate impact claim, and Defendants are entitled to judgment as a matter of law on this claim.

## IV. Conclusion

Because the record contains no facts to support Plaintiff's discrimination and retaliation claims, the Court grants Defendants' motion for summary judgment [145] and directs the Clerk to enter judgment in favor of Defendants on all counts of Plaintiff's second amended complaint [78].

Dated: March 29, 2023    Entered:

John Robert Blakey
United States District Judge

17